**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

COURTNIE WASHINGTON,

               Plaintiff,

v.

THE CITY OF JERSEY CITY, *et al.*,

               Defendants.

Civil Action No. 24-8597 (SDW) (JSA)

**OPINION**

June 23, 2025

**WIGENTON**, District Judge.

Before this Court are two motions to dismiss Plaintiff Courtnie Washington's complaint (D.E. 1 ("Compl.")).  The first was filed by Defendants Jersey City Police Department ("JCPD") Officers Stephen Gigante, Felix DeJesus, Andrew Alas, Jasmere Epps, Auronny De La Cruz, and Christian Ortiz, JCPD Sergeant Ryan Friend, JCPD Captain Jason Field, JCPD Deputy Chief Joseph Santiago, and the City of Jersey City ("JC") (collectively the "City Defendants").  (D.E. 36.)  The second was filed by Defendants Jersey City Medical Center ("JCMC"), RWJ Barnabas Health ("RWJB"), and Emergency Medical Technicians ("EMTs") Juan Miranda and Hunter Jackman (collectively the "Hospital Defendants").  (D.E. 47.)  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78.  For the reasons stated herein, both motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.

## I. <u>BACKGROUND AND PROCEDURAL HISTORY</u>[1]

This case arises from a police encounter in JC on August 27, 2023 that tragically resulted in the death of Andrew Jerome Washington III.  (Compl. ¶ 22.)  Mr. Washington was fifty-two years old and "had multiple mental health disabilities, including bipolar disorder, schizophrenia, and bouts of psychosis which involved auditory hallucinations."  (*Id.* at ¶¶ 13, 22.)  Plaintiff Courtnie Washington is Mr. Washington's sister and the administrator of his estate.  (*Id.* at ¶ 23.)  Her claims are brought on behalf of the estate.  (*Id.*)

In the days prior to August 27, 2023, Mr. Washington's family was concerned that he was "in the midst of a mental health episode and that he was not taking his medication."  (*Id.* at ¶ 54.)  The family placed multiple calls to JCMC's "24-hour hotline for psychiatric emergencies, crisis intervention services, and … mobile outreach to all area residents experiencing acute psychiatric distress" (*id.* at ¶¶ 35, 54) and RWJB's "Behavioral Health Access Center, which provides 24/7 mental health support for callers to a hotline by providing referrals, including for emergency psychiatric services; rapid assessment and disposition planning; crisis intervention; hospital diversion services; and screening for hospitalization" (*id.*at ¶¶ 36, 54).  The family was "repeatedly told no mental health personnel were available."  (*Id.* at ¶ 54.)

On August 26, 2023, "given the unavailability of emergency psychiatric services, … JCPD officers including [Officer] Alas, were dispatched to [Mr. Washington]'s home to check on [him]."  (*Id.* at ¶ 55.)  Mr. Washington was outside of his apartment building, and officers spoke to him on the porch.  (*Id.* at ¶ 56.)  The officers "observed that [Mr. Washington] was experiencing delusions and other mental health symptoms" but "declined to take [him] to [JCMC] for evaluation or into custody."  (*Id.* at ¶ 57.)

---

[1] The facts in this section are derived from the complaint and taken as true for purposes of this motion to dismiss.  *See Mayer v. Belichik*, 605 F.3d 223, 229 (3d Cir. 2010).

The next day, Mr. Washington's family again called "the hotline and/or the [Behavioral Health] Access Center." (*Id.* at ¶ 58.) The call was transferred to the Hudson County Communications Emergency Network ("HUDCEN"), which is "the designated public safety dispatch point for emergency medical 9-1-1 calls in greater Hudson County" operated by Hudson County, JCMC, "and/or" RWJB. (*Id.* at ¶¶ 34–35, 58.) The family "requested that a mental health professional from the advertised mobile crisis unit come to [Mr. Washington]'s home" out of concern that he "had not been taking his medication." (*Id.* at ¶ 58.) "HUDCEN dispatched [Emergency Medical Services and] called JCPD officers to the scene." (*Id.*)

Officers Alas, De La Cruz, Ortiz, and Epps and the EMTs Miranda and Jackson arrived first. (*Id.* at ¶ 60.) On the sidewalk, Mr. Washington's family told the officers that Mr. Washington had bipolar disorder, was "recently … released from a psychiatric hospitalization," and "was believed to be off his medication," but was not violent. (*Id.* at ¶ 61.) Officers Alas and Ortiz and the EMTs "entered the stairwell of [Mr. Washington]'s building and spoke to [him] through the door of his second-floor apartment." (*Id.* at ¶ 62.) Mr. Washington was "noticeably agitated" and "yelled statements [indicating that he] was experiencing delusions and auditory hallucinations," including calling the Defendants ghosts and requesting that they leave. (*Id.*) In response, some or all of the Defendants in the stairwell "laughed at" Mr. Washington. (*Id.* at ¶ 63.) They then "called for backup" from the Emergency Services Unit ("ESU"). (*Id.* at ¶ 65.)

The ESU is "a heavily armed, SWAT-like police unit trained to respond to terrorism events and violent and barricaded criminal suspects." (*Id.*) ESU members, including Officers Gigante and DeJesus, Sergeant Friend, and Captain Field arrived on the scene, and they were in communication with Deputy Chief Santiago over radio. (*Id.* at ¶ 60.) Officers Gigante and DeJesus "entered the stairwell of [Mr. Washington]'s building with shields and tactical gear" and

communicated with him through his apartment door. (*Id.* at ¶¶ 66–67.) "Officers taped over the peephole on [Mr. Washington]'s door[,] secured the door by tying a rope around the doorknob and … stood outside [the] door with shields and weapons drawn." (*Id.* at ¶ 67.)

Upon ESU's arrival, Mr. Washington "immediately told [Officer] Gigante to stop knocking on his door," but Officer Gigante "continued to bang on [the] door throughout the encounter." (*Id.* at ¶ 69.) Mr. Washington also "continued to express that he was agitated by the police presence: he told the ESU officers to get out and leave; stated that he did nothing wrong, did not call police, and that officers were disrespecting him; he yelled out to officers that he was not their 'slave.'" (*Id.* at ¶ 68.) He also yelled "[l]eave! If you don't want to bother me or disrespect me, leave." (*Id.* at ¶ 72 (alteration in original).) Officer Gigante "sighed audibly" and said "come on man, just cooperate with us." (*Id.* at ¶ 73.)

"Defendants spoke to one another outside [Mr. Washington]'s door about retrieving weapons and audibly readied their tasers." (*Id.* at ¶ 70.) They also "blocked [Mr. Washington]'s family from entering the building and speaking with [him], or learning information about the true circumstances of the ongoing police encounter taking place inside. A family member outside specifically asked [Officer] Epps for permission to speak with [Mr. Washington]. Defendants ignored the request." (*Id.* at ¶ 71.)

Officers Gigante and DeJesus "began preparing to force entry into [Mr. Washington]'s apartment by putting on additional tactical gear, including helmets and gloves." (*Id.* at ¶ 75.) With approval from Sergeant Friend and Deputy Chief Santiago, Officers Gigante and DeJesus broke down the door to Mr. Washington's apartment. (*Id.* at ¶¶ 75–78.) "Split seconds later," they saw Mr. Washington "in his apartment alone holding a kitchen knife. [Officer] Gigante discharged his

firearm, shooting [Mr. Washington] twice, while [Officer] DeJesus discharged his taser, tasing [Mr. Washington]." (*Id.* at ¶ 79.)

Mr. Washington's family was still outside on the sidewalk, and "[a]fter the sound of shots rang out, Defendant officers … falsely represented to [Mr. Washington]'s family that [he] had been shot with a pellet gun." (*Id.* at ¶ 80.) As Mr. Washington was transferred to an ambulance, "JCPD officers instructed family members to step back and not to speak to [him]. Although the family requested to accompany [him] in the ambulance to the hospital, JCPD officers told them they could not do so." (*Id.* at ¶ 81.) Mr. Washington later "died at the hospital with no loved ones present." (*Id.* at ¶ 82.)

The following day, "Jersey City Mayor Steven Fulop called a press conference to announce that he fully endorsed the actions taken by JCPD officers and [JCMC]." (*Id.* at ¶ 85.) He "claimed Defendants acted consistent with Jersey City policies, practice, guidance, and training," and stated the officers' actions were "in line with the communications that were taught at the Jersey City Police Department." (*Id.* at ¶¶ 85–86.) Public Safety Director James Shea also stated that the officers' actions were "within guidelines and use of force guidelines." (*Id.* at ¶ 86.) Finally, JC officials also made "false public statements that a mental health professional had been present," including that "a crisis intervention specialist was the first to evaluate the situation." (*Id.* at ¶ 88.)

Plaintiff filed her complaint on August 21, 2024 against the City Defendants, the Hospital Defendants, and Hudson County. (Compl. at ¶¶ 24–38.) The complaint brings seventeen counts including excessive force, warrantless entry, civil conspiracy, *Monell* liability, disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), assault, battery, false imprisonment, negligent training and supervision, negligence,

wrongful death, and survivorship.[2]  (*Id.* at ¶¶ 111–240.)  She seeks compensatory and punitive damages.  (*Id.*)

The City Defendants filed a motion to dismiss on November 6, 2024.  (D.E. 36.)  The Hospital Defendants filed a motion to dismiss on December 17, 2024.  (D.E. 47.)  Opposition and reply briefs to both were timely filed.  (D.E. 43 ("City Opp."); D.E. 46 ("City Reply"); D.E. 52 ("Hosp. Opp."); D.E. 60 ("Hosp. Reply").)  Hudson County has not moved to dismiss, and it answered the complaint on November 8, 2024.  (D.E. 40.)

## II.   <u>LEGAL STANDARD</u>

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

When deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim, courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff," and "determine whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint."  *Belichik*, 605 F.3d at 229.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "[L]abels and conclusions, and ... formulaic recitation[s] of

---

[2] Some of these substantive claims are brought as multiple counts against different groups of Defendants or under different provisions of law.

6

the elements of a cause of action" are insufficient to withstand a motion to dismiss, *Twombly*, 550 U.S. at 555, as are "'naked assertion[s]' devoid of 'further factual enhancement'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

## III.   **DISCUSSION**

### A.   **The City Defendants' Motion**

The City Defendants move to dismiss all claims against them.  (D.E. 36.)  They specifically address the claims for warrantless entry, civil conspiracy, *Monell* liability, negligent training and supervision, assault and battery only as to Sergeant Friend, false imprisonment, disability discrimination, negligence, wrongful death, and survival.  They also argue the general defenses that the complaint is an impermissible group pleading, that they are immune from all claims under qualified immunity, that no liability can be found under the doctrine of *respondeat superior*, and that Plaintiff is not entitled to punitive damages.  (*See* D.E. 36-1 ("City Mot.").)

#### 1.   **Group Pleading**

First, the City Defendants argue that the complaint includes group pleadings that must be dismissed under Rule 8.  (*Id.* at 5.)  Group pleadings are impermissible because they "fail[] to put defendants on notice of the claims against them."  *Miretskaya v. Rutgers State Univ. of N.J.*, No. 20-14856, 2022 WL 3020153, at *3 (D.N.J. July 29, 2022).  "However, group pleading may be permissible where the complaint sets forth sufficient facts to put individual defendants on notice of claims against them."  *In re Swarthmore Grp., Inc.*, 667 B.R. 258, 269–70 (Bankr. E.D. Pa. 2025) (finding that "mere 'group pleading' alone" did not justify dismissal because there was "no genuine uncertainty in the[] Counts as to which Defendant is alleged to have done what").  "[A]llegations levied against multiple defendants satisfy Rule 8 when 'there is no genuine uncertainty regarding who is responsible for what,' such as when multiple defendants 'are accused

of acting jointly.'" *Corbin v. Bucks Cnty.*, 703 F. Supp. 3d 527, 533 (E.D. Pa. 2023) (quoting *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013)).

As an initial matter, the City Defendants appear to be mistaken as to which claims were brought against which Defendants. They seek to dismiss the assault and battery claims as to Officers Alas, Epps, De La Cruz, and Ortiz, Captain Field, and Deputy Chief Santiago. (City Mot. at 6.) Those claims were not pled against those Defendants. (Compl. ¶¶ 205–14.) They also seek to dismiss the warrantless entry, wrongful death, and survivorship claims as to Officers Alas, Epps, De La Cruz, and Ortiz, and Captain Field (City Mot. at 6), against whom those claims were not brought (Compl. ¶¶ 118–23, 198–204, 230–40). The City Defendants may be confused as to which claims are brought against them, but it is not because of group pleading—to the contrary, Plaintiff precisely identified which officials are being sued for which claims.

Even for the claims that do name several individual defendants, the complaint is pled specifically enough at this stage. It delineates which counts are brought against which Defendants and specifies who took which actions—Officers Alas and Ortiz first entered the stairwell with the EMTs (*id.* at ¶ 62); Sergeant Friend and Deputy Chief Santiago approved breaking down the door (*id.* at ¶ 75), and Officer Gigante fired his gun (*id.* at ¶ 79), for example. To the extent it alleges Defendants acted jointly (*see, e.g., id.* at ¶ 125 ("[The JCPD employees and EMTs] agreed among themselves to act in concert to deprive [Mr. Washington] of his clearly established constitutional rights"), the claims are not unsubstantiated—all of the JCPD employees were on the scene or communicating with each other through the radio. This is not the same as a complaint that "fail[s] to state which defendants engaged in allegedly wrongful conduct." *Zuniga v. Am. Home. Mortg.*, 2016 U.S. Dist. LEXIS 155256, at *19–20 (D.N.J. Nov. 8, 2016). Because the allegations "permit each defendant … to understand the nature of the allegations levied against them," the complaint

will not be dismissed for group pleading. *Corbin*, 703 F. Supp. at 533. The facts, as they develop, may of course fail to support that an individual Defendant engaged in the alleged conduct. Dismissal at this stage, however, on the sole basis of group pleading would be premature. The complaint describes the individual Defendants' conduct and clearly indicates which ones are associated with each cause of action, and it appears to be the City Defendants, not Plaintiff, that believe each individual Defendant is being sued for each count.

### 2. Federal Claims

#### a. Against Individual Defendants

The City Defendants move to dismiss the claims against the JCPD officials alleging violations of federal law. They specifically argue that Plaintiff has failed to state a claim with respect to warrantless entry and civil conspiracy. They also argue, however, that qualified immunity protects the JCPD officials from all the claims in the complaint. (City Mot. at 26.) Because the qualified immunity analysis subsumes the question of whether Plaintiff has stated a claim that a right was violated, the federal claims against the JCPD officials will be reviewed for the applicability of qualified immunity.

"The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether qualified immunity applies involves a two-part inquiry: first, do the allegations in the complaint show that defendant's conduct violated a constitutional or statutory right; second, was the right clearly established at the time of the alleged

violation.[3]  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (no longer requiring determination of *Saucier* prongs in sequential order); *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).  This second question "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"  *Sheehan*, 575 U.S. at 611 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "[A] case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft*, 563 U.S. at 741.

"[T]he burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff."  *Thomas v. Indep. Twp.*, 463 F.3d 285, 293 (3d Cir. 2006).  Although qualified immunity issues should be resolved at "the earliest possible stage in litigation," *id.* at 291 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)), "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases," *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009).  "[Q]ualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint."  *Indep. Twp.*, 463 F.3d at 291.

---

[3] The City Defendants make much of the argument that the allegedly violated right must be clearly defined.  (City Mot. at 26–28.)  This is another way of phrasing the second part of the qualified immunity inquiry—for the right to have been clearly established, its "contours [must have been] sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it."  *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).  This does not preclude, as the City Defendants suggest, clear violations of well-known constitutional rights such as "the right to be free from excessive force" from surviving a qualified immunity defense.  (*See* City Mot. at 30 (arguing that the right to be free from excessive force is too "generic" for denial of qualified immunity).)  The question is whether "a reasonable officer [would have been] on notice that his or her conduct under the circumstances is clearly unlawful."  *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010); *Cole v. Encapera*, 758 F. App'x 252, 254–55 (3d Cir. 2018) (asking whether the "right at issue was clearly established at the time of the alleged violation such that a reasonable official would understand that what he is doing violates that right").

### i. Warrantless Entry

The City Defendants first move to dismiss the warrantless entry claim alleged against Officers DeJesus and Gigante, Sergeant Friend, and Deputy Chief Santiago.  Plaintiff alleges warrantless entry in Count Two, under the Fourth Amendment and 42 U.S.C. § 1983, and Count Ten, under the New Jersey Constitution and the New Jersey Civil Rights Act ("NJCRA").  Both the substantive right to be free from warrantless entry[4] and the qualified immunity defense[5] are the same under the NJCRA and § 1983, so this Court will examine these claims together.

The first question is whether the allegations show a violation of Mr. Washington's constitutional rights.  The Fourth Amendment forbids "unreasonable searches and seizures."  U.S. Const. Amend. IV.  "Searches of a home without a warrant are presumptively unreasonable, though the warrant requirement is subject to carefully defined exceptions."  *Ray*, 626 F.3d at 174. The City Defendants argue that they entered Mr. Washington's apartment pursuant to the exigent circumstances exception to the warrant requirement.[6]  (City Mot. at 9–10.)  "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is 'heavy.'"  *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)).  Exigent circumstances include "the risk of danger to

---

[4] "The NJCRA is … generally interpreted nearly identically to § 1983 and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under § 1983."  *Williams v. Vanderud*, Civ. No. 16-1245, 2017 WL 4274265, at *11 (D.N.J. Sept. 26, 2017) ("analyz[ing] … NJCRA claims through the lens of Section 1983").

[5] "For purposes of analyzing the qualified immunity defense [against § 1983 claims and NJCRA claims], the examination for both is the same."  *Morillo v. Torres*, 117 A.3d 1206, 1213 (N.J. 2015).

[6] The City Defendants also state that they "did not need a warrant … because they engaged in community-caretaking tasks which permit[] officers to enter properties without a warrant under the emergency aid exception."  (City Mot. at 9.)  This statement mistakenly conflates two distinct exceptions to the warrant requirement.  "The community caretaking doctrine cannot be used to justify warrantless searches of a home."  *Ray*, 626 F.3d at 177.  Exigent circumstances can, however, and the need for emergency aid is "one such exigency."  *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).  This Court considers the City Defendants' arguments insofar as they rely on the exigent circumstances exception.

the police or to the other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). Whether exigent circumstances exist is "determined by reviewing the objective facts reasonably known to the officers at the time of the search using the totality of the circumstances facing the officers when the search was performed." *United States v. Morgan*, 33 F. App'x 603, 605 (3d Cir. 2002).

The City Defendants assert that exigent circumstances existed because Mr. "Washington's family confirmed he was in danger of hurting himself" and he "ignored police instructions and refused to open his door while making statements indicating he was delusional and experiencing a mental health episode." (City Mot. at 11–12.) They also assert that the family's call for help establishes exigent circumstances. (City Reply at 2.) Plaintiff disputes the existence of exigent circumstances. (City Opp. at 10.) She denies that Mr. Washington's family told the officials that he was in danger of hurting himself—according to the complaint, on the day of Mr. Washington's death, his family told the JCPD officers that he was not violent. (Compl. ¶ 61; City Opp. at 13.) According to Plaintiff, the JCPD officials' belief in a "theoretical possibility of harm" did not amount to exigent circumstances, nor did Mr. Washington's refusal to open the door create them. (City Opp. at 12.)

At this stage, the City Defendants have not met their burden of establishing exigent circumstances. Their contention that Mr. "Washington's family confirmed he was in danger of hurting himself" (City Mot. at 11) is directly contradicted by the complaint (Compl. ¶ 61). At this stage, this factual dispute must be resolved in Plaintiff's favor, so the City Defendants' contention regarding danger cannot support their exigent circumstances argument. *See Belichik*, 605 F.3d at 229. The City Defendants' remaining contentions—that Mr. Washington refused to obey their instructions and was having a mental health episode, and that his family called for help—are

insufficient to establish that he was in imminent danger requiring their forced entry.  As a threshold issue, the facts at this stage do not support that the family members called the police.  (Compl. ¶ 58.)  Even if they had, a call reporting that someone is having a mental health crisis, alone, does not establish the imminent danger required for exigent circumstances.  *See Gurvey v. Twp. of Montclair*, Civ. No. 19-17525, 2022 WL 970303, at *9 (D.N.J. Mar. 31, 2022) (finding no exigent circumstances despite request for a wellness check).  Because the City Defendants have not met the "heavy" burden of establishing exigent circumstances, and they do not assert any other relevant exceptions to the warrant requirement, the complaint adequately states that Mr. Washington's Fourth Amendment right against warrantless searches was violated.  *Welsh*, 466 U.S. at 749–50.[7]

The next question under the qualified immunity analysis is whether the constitutional right was clearly established at the time of the violation.  The City Defendants retain the burden on this part of the inquiry, and they have failed to carry it.  At this stage, the violation of a clearly established right is straightforward: warrantless searches are presumptively unreasonable without an exception to the warrant requirement, and the exception asserted here, exigent circumstances, is unsupported by the facts as they must be accepted at this stage.[8]  In other words, the City

---

[7] The City Defendants argue that Sergeant Friend and Deputy Chief Santiago did not violate Mr. Washington's right to be free from warrantless entry because they did not physically enter the apartment.  (City Mot. at 29–30.)  The complaint alleges that the officials acted "in concert" and that Sergeant Friend and Deputy Chief Santiago were not only aware that Officers DeJesus and Gigante were going to break down Mr. Washington's door, but that they approved of it.  (Compl. ¶¶ 75, 119.)  At this stage, making all reasonable inferences in Plaintiff's favor, it would be premature to dismiss the warrantless entry claims against Sergeant Friend and Deputy Chief Santiago without further factual development.  *See Sharrar v. Felsing*, 128 F.3d 810, 825 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209–11 (3d Cir. 2007) (reversing grant of summary judgment in favor of "highest ranking officer at the scene" that "did not personally search the premises" because he "ordered [another] to conduct the search" and "a reasonable jury could conclude that the search was conducted under his direction"); *Bryant v. Traendly*, Civ. No. 19-4758, 2020 WL 1065704, at *1, *3 (D.N.J. Mar. 5, 2020) (declining to dismiss, under 12(b)(6) standard, Fourth Amendment claims against officer who "ordered the search and seizure of Plaintiff's mobile device" but did not conduct the search).

[8] The JCPD officers also cannot argue that they reasonably but mistakenly relied on the community caretaking exception to the warrant requirement—since 2010, it has been clearly established law in the Third Circuit that "[t]he community caretaking doctrine cannot be used to justify warrantless searches of a home."  *Ray*, 626 F.3d at 177.

Defendants' argument relies entirely on the JCPD officials' belief that Mr. Washington was a danger to himself or others.  Because the Court cannot accept the reasonability of that belief at this stage, their conduct clearly violated Mr. Washington's right to be free from warrantless entry.[9]

Case law also supports that the officers' conduct was a clearly established violation of Mr. Washington's right to be free from warrantless entry.  In *Gurvey*, the court denied qualified immunity to officers who "forced their way in" to a suicidal man's home because it was not clear whether they "actually witnessed anything that suggested it was necessary to break in before a warrant was obtained."  2022 WL 970303, at *2, *10.  The court rejected the officers' argument that "the request for a wellness check and the fact that '[the] door was not yet open'" justified their entry.  *Id.* at *10.  The officers also offered no evidence "as to how long it would have taken to obtain a warrant."  *Id.* at *11.  Given the alternative option of obtaining a warrant over the phone, which did not appear to have been considered, the court held that "[i]t should have been clear to a reasonable officer that the forced entry … could not have been legally justified."  *Id.*

There are no factual differences between *Gurvey* and the present case material to the qualified immunity analysis.  In both cases, defendants assert that a report of a mental health crisis justified their warrantless entry, but a review of the record in *Gurvey* and the complaint here reveal that there was no reasonable basis for the claim of exigency.  Lacking any reasonable basis for believing someone inside the building was in imminent danger, defendants in both cases tried to argue another, invalid, basis for exigency—the *Gurvey* defendants argued that the door was not open, and the City Defendants here argue that Mr. Washington refused to comply with their

---

[9] In the portion of the City Defendants' brief addressing whether the right was clearly established, they write only that Mr. Washington "refused to comply with Police instructions including opening his door and exiting his apartment." (City Mot. at 30.)  This argument, which does not even mention that the officials believed Mr. Washington was dangerous, does not support that exigent circumstances existed.  Non-compliance with police instructions is simply not an exception to the warrant requirement.

instructions to open the door.  (City Mot. at 11–12, 30.)  And here, as in *Gurvey*, Defendants do not mention attempting to obtain a warrant.  Simply asserting the exigent circumstances exception, when the record does not support that any exigency was known to the officer at the time of the search, does not make qualified immunity applicable.  *See also Kleinberg v. Clements*, Civ. No. 09-4924, 2012 WL 1019290, at *5 (D.N.J. Mar. 23, 2012) (denying summary judgment sought by officers arguing that exigent circumstances justified warrantless entry when record did not support that plaintiff was violent or "express[ed] any desire to harm himself"); *United States v. Wolfe*, 452 F. App'x 180, 184 (3d Cir. 2011) (holding that exigent circumstances did not justify warrantless search when "none of the evidence available to [searching officer] when he arrived suggested that there was another victim or threat in the home").

### ii.  Excessive Force

Next, this Court turns to the excessive force claims against Officers DeJesus and Gigante. As with warrantless entry, the excessive force claims arise under both the Fourth Amendment and the NJCRA, so they will be addressed together.  *Morillo*, 117 A.3d at 1213.  The first question is whether Plaintiff has stated a constitutional violation.  "[C]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor,* 490 U.S. 386, 395 (1989).  "An officer's use of deadly force is reasonable when 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Luna-Diaz v. City of Hackensack Police Dep't*, Civ. No. 16-3270, 2022 WL 18024213, at *13 (D.N.J. Dec. 30, 2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  "[R]easonableness of the use of force is evaluated under an 'objective' inquiry" and "must be judged from the perspective of a reasonable

15

officer on the scene." *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) (quoting *Graham*, 490 U.S. at 396)).

The court must consider "the 'totality of circumstances' leading up to the shooting" and may consider whether conduct precipitating the use of force proximately caused the use of force. *Johnson v. City of Philadelphia*, 837 F.3d 343, 350–53 (3d Cir. 2016). "Proper analysis of this proximate cause question require[s] consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and require[s] the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Mendez*, 581 U.S. at 431 (quoting *Paroline v. United States*, 572 U.S. 434, 444 (2014)). "[S]ubject to qualified immunity," a plaintiff may "generally recover damages that are proximately caused by any Fourth Amendment violation." *Id.*

The complaint alleges that shooting and tasing Mr. Washington were acts of excessive force. (Compl. ¶¶ 113, 191.)  Mr. Washington was holding a knife when officers broke down his door. (*Id.* at ¶ 79.)  The City Defendants, however, in arguing that the knife justified the use of force, write only that Mr. Washington "was wielding a knife that he refused to drop[, and] did not have the right to use or point a knife [at] any officer." (City Mot. at 30.)  This argument falls woefully short of articulating why deadly force was reasonable. First, someone acting in a way that they do not have the "right" to does not justify deadly force. It seems that the City Defendants are trying to rely on the rule that deadly force is reasonable when officers have probable cause to believe that the suspect poses a significant threat of death or serious physical injury. Nowhere in their opposition brief however do they provide that rule or state that they believed that Mr. Washington posed such a threat. Accordingly, they have not put forth a viable argument that their use of deadly force was reasonable.

Even if the officers had stated that they believed Mr. Washington posed a significant threat, they could still be liable for excessive force because it was proximately caused by their prior unconstitutional actions. A reasonable officer would have foreseen that entering the home of someone having a mental health episode and who wanted the police to leave would result in a violent, deadly confrontation—that series of events, unfortunately, occurs frequently. *See, e.g.*, *Luna-Diaz*, 2022 WL 18024213, at *1 (police entered home of man with schizoaffective disorder to perform wellness check and "shot and killed [him] in his kitchen as he held a meat cleaver"); *Est. of Vargas v. Cnty. of Hudson*, Civ. No. 14-1048, 2020 WL 3481774, at *2 (D.N.J. June 26, 2020) (officers "physically broke" door to home of a man suffering from schizoaffective disorder, who was holding a knife, and shot and killed him); *Est. of Del Rosario v. Paterson Police Dep't*, Civ. No. 14-5167, 2020 WL 373354, at *1–2 (D.N.J. Jan. 23, 2020) (officers entered bedroom of "Emotionally Disturbed Person," who was holding a hammer, and shot and killed him); *Morais v. City of Philadelphia*, Civ. No. 06-582, 2007 WL 853811, at *2 (E.D. Pa. Mar. 19, 2007) (officers entered home of man suffering from chronic paranoid schizophrenia, found him holding knives, and shot and killed him).

Here, the officers knew that Mr. Washington was mentally ill and delusional, and his statements made his desire for the police to leave clear. (*See, e.g.*, Compl. ¶¶ 68, 72.) On these facts, it was reasonably foreseeable that breaking down the door would lead to the use of deadly force. Because the entry, which is considered unconstitutional at this stage, proximately caused the use of deadly force, the complaint has adequately pled that Officers Gigante and DeJesus violated Mr. Washington's right to be free from excessive force.[10]

---

[10] For the same reasons, Plaintiff's negligence claim is adequately pled. The officials that responded to the family's call for assistance owed a duty to Mr. Washington. *See Boswell v. Eoon*, Civ. No. 08-5098, 2013 WL 5863741, at *5 (D.N.J. Oct. 30, 2013) (quoting *Aversano v. Palisades Interstate Parkway Comm'n*, 832 A.2d 914, 925 (N.J. Super. Ct. App. Div. 2003)) (discussing "common law duty of police officers to perform their duties adequately"). As

It was also clearly established that their conduct violated this right. In 2016, the Third Circuit "sound[ed] a note of caution" that police officers are not "broadly immunize[d] … from Fourth Amendment liability whenever a mentally disturbed person threatens [their] physical safety." *Johnson*, 837 F.3d at 352–53. Whether such a threat severs the chain of proximate causation depends on a few factors, including "whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions." *Id.* at 352. At the time of Mr. Washington's shooting, district courts in this circuit had applied this rule to find that officers who proximately caused the need for deadly force violated the Fourth Amendment. *See Luna-Diaz*, 2022 WL 18024213, at *16; *Ardo v. Pagan*, 652 F. Supp. 3d 545, 560 (E.D. Pa. 2023) ("[A] reasonable officer could have foreseen that approaching a suicidal person carrying an explosive device all while visibly wielding a gun and shouting commands at said person could … plac[e] the officer's life at risk and necessitating the use of deadly force."); *see also Vargas*, 2020 WL 3481774, at *8 (denying qualified immunity defense to officers who argued only that the use of force did not violate a clearly established right but did not address "whether the … officers were legally inside the trailer when they decided to use deadly force").

Because of the deficiency of the City Defendants' arguments and this Court's finding that their unconstitutional warrantless entry proximately caused the use of force, the City Defendants' motion to dismiss the excessive force claims is denied.

---

established above, their actions "f[ell] below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm," breaching that duty. *Kemp v. Est. of Brandau*, No. A-4161-19, 2022 WL 1179741, at *7 (N.J. Super. Ct. App. Div. Apr. 21, 2022) (quoting *Franco v. Fairleigh Dickinson Univ.*, 248 A.3d 1254, 1263 (N.J. Super. Ct. App. Div. 2021)). As also established above, their conduct proximately caused Mr. Washington's death. Accordingly, the City Defendants' motion to dismiss the negligence claim is also denied. *See Est. of del Rosario v. Paterson Police Dep't*, Civ. No. 14-5167, 2015 WL 1759473, at *4 (D.N.J. Apr. 17, 2015) (denying officer, city, and police department's motion to dismiss negligence claim when officer broke down bedroom door of someone believed to be off his medication and shot him).

### iii. Civil Conspiracy

The City Defendants also move to dismiss the § 1983 civil conspiracy claim.  (City Mot. at 8–9.)

> A civil conspiracy under § 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage."

*Jones v. Dalton*, 867 F. Supp. 2d 572, 585 (D.N.J. 2012) (quoting *Adams v. Teamsters*, 214 F. App'x 167, 172 (3d Cir.2007)).  "[A] plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the 'exact limits of the illegal plan or the identity of all participants,' as long as plaintiff alleges that each participant shared in 'the general conspiratorial objective.'"  *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998) (quoting *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998–99 (N.J. App. Div. 1993)).

As explained above, the complaint has adequately stated that the JCPD officials committed unlawful acts.  It also alleges that they "agreed among themselves to act in concert to deprive [Mr. Washington] of his clearly established constitutional rights."  (Compl. ¶ 125.)  The officials responded to the call together, either on the scene or communicating with people there regarding their anticipated actions, and Sergeant Friend and Deputy Chief Santiago understood and approved of Officers Gigante and DeJesus's plan to break down the door.  (*Id.* at ¶¶ 60, 71, 75.)  An agreement among the JCPD officials is not so implausible as to warrant dismissal.  Common sense, which may be relied on at this stage, *Iqbal*, 556 U.S. at 679, suggests that police officers work together in a coordinated effort when responding to a call together, as opposed to each acting according to their own independent decisions.  The City Defendants' argument that "nothing in the Complaint describes any communications that rise to the level of an agreement to violate [Mr.]

Washington's rights" (City Mot. at 8–9), is not necessarily accurate in view of the approval of the decision to break down the door. Nor is it dispositive, as the complaint need not identify an express agreement. *Eli Lilly*, 23 F. Supp. 2d at 496.

As Plaintiff has stated a claim for conspiracy, next is the clearly established question. At the time of the incident in question, it was well established that when police officers "acted in concert" to violate a constitutional right, they could be liable for civil conspiracy. *Encapera*, 758 F. App'x at 257 (affirming denial of summary judgment to officers asserting qualified immunity because plaintiff "present[ed] evidence that his rights under the First Amendment were violated and that [the officers] acted in concert"). The constitutional violations here were clear, and it is also plainly alleged that the officers acted together, including by approving of the decision to break down the door and keeping family outside. On these facts, and absent an articulated qualified immunity argument on civil conspiracy by the City Defendants—the party bearing the qualified immunity burden—the civil conspiracy claim may proceed.

### b. Against JC Only

#### i. *Monell*

The City Defendants also seek dismissal of the *Monell* claim against JC. A municipality may be held liable under § 1983 where the injury results from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).[11] "[A]cts of a government employee may be deemed to be the result of a policy or custom" in three situations: when "the appropriate officer or entity promulgates a generally applicable

---

[11] *Monell* claims may also be based on a theory that the municipality failed to train its employees. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Plaintiff's *Monell* claim does not arise under that theory. (City Opp. at 20.) The complaint includes a claim for negligent training and supervision against JC (Count 14), but unlike the *Monell* claim under § 1983, it arises under state law. (*Contrast* Compl. ¶¶ 127–32, *with* Compl. ¶¶ 221–23; City Opp. at 34–35.)

statement of policy and the subsequent act complained of is simply an implementation of that

policy;" when "no rule has been announced as policy but federal law has been violated by an act

of the policymaker itself;" and when

> the policymaker has failed to act affirmatively at all, [though] the need to take some
> action to control the agents of the government "is so obvious, and the inadequacy
> of existing practice so likely to result in the violation of constitutional rights, that
> the policymaker can reasonably be said to have been deliberately indifferent to the
> need."

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (second alteration in

original) (footnote omitted) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397,

417–18 (1997) (Souter, J., dissenting)).

Monell claims based on custom or policy "must identify a custom or policy, and specify

what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir.

2009). A "policy or custom … 'cannot ordinarily be inferred from a single instance of illegality.'"

*Est. of Kamal v. Twp. of Irvington*, 790 F. App'x 395, 398 (3d Cir. 2019) (quoting *Losch v.

Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984)) (denying *Monell* claim when plaintiff

pointed to events of the case "as its only evidence of [defendant's] alleged policy, custom, or

practice").

Plaintiff alleges that Mr. Washington's rights were violated pursuant to "official policies,

practices, and/or customs" of JC. (Compl. ¶ 129.) Specifically, she alleges that JC had a policy

or custom to take the complained-of actions in this case. (*Id.* (alleging that it was JC's policy and

custom to "respond[] with police officers unaccompanied by trained mental health professionals,

using a heavily armed, SWAT-like force …, escalat[e] the situation instead of de-escalating, and

break[] down the door to enter an apartment without legal justification.").) Plaintiff declines to

identify any other instances of JC officials acting pursuant to these alleged policies or customs,

however.  (City Opp. at 19–20.)  Instead, she relies on only Mayor Fulop's and Director Shea's statements following the incident, which "endorsed and ratified all actions of the JCPD officers … making clear their actions were pursuant to Jersey City and JCPD policies, customs, and practices." (Compl. ¶ 130; City Opp. at 17 ("These statements … alone satisf[y] Plaintiff's minimal burden at the pleading stage.").)

The facts of this case alone are insufficient to establish that the officers acted pursuant to a policy or custom.  *See Est. of Kamal*, 790 F. App'x at 398; *see also E.S. v. Elizabeth Bd. of Educ.*, Civ. No. 20-1027, 2023 WL 398133, at *7 (D.N.J. Jan. 25, 2023) (finding no custom or policy when plaintiffs "failed to plead any facts that suggest a pattern of similar incidents before the subject incident").  Mayor Fulop's and Director Shea's statements, made after the fact, also do not establish that JC had a custom or policy of committing the alleged constitutional violations.  While an official "statement of policy" can support a policy or custom, *Monell* liability is appropriate when a "*subsequent* act complained of [implements] that policy."  *Natale*, 318 F.3d at 584 (emphasis added).  A policy statement made after the complained-of constitutional violation cannot be held to have established the policy that caused it.[12]

Even if Mayor Fulop's and Director Shea's statements could establish that the JCPD acted pursuant to a policy or custom, they do not support that the policy or custom was specifically one of "responding with police officers unaccompanied by trained mental health professionals, using

---

[12] This is also why a municipality's failure to discipline officers following a constitutional violation does not establish a policy or custom under *Monell*.  *See Gregor v. Johnsen*, Civ. No. 14-219, 2017 WL 11368374, at *8 (M.D. Pa. Nov. 3, 2017), *report and recommendation adopted*, Civ. No. 14-219, 2019 WL 3549603, at *2 (M.D. Pa. Aug. 5, 2019) ("[Plaintiff]'s assertion that the City 'ratified' [police officer]'s conduct by failing to discipline him after the fact fails to explain how the City played any role in causing the allegedly constitutional violation in the first place."); *Gillette v. Delmore*, 979 F.2d 1342, 1348–49 (9th Cir. 1992) ("[H]old[ing] cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 [and create an] end run around *Monell*.")  As with the discipline cases, here, "the only action attributed to the City … took place after" the incident in question.  *Gregor*, 2017 WL 11368374, at *8. As a result, Plaintiff has not adequately pled that the City's actions "caused the constitutional wrongdoing."  *Id.*

a heavily armed, SWAT-like force …, escalating the situation instead of de-escalating, and breaking down the door to enter an apartment without legal justification." (Compl. ¶ 129.)  *Monell* claims must specify "what exactly [the] custom or policy was," and Plaintiff cannot meet this burden with only Mayor Fulop's and Director Shea's statements as support.  *McTernan*, 564 F.3d at 658.  Because Plaintiff has not pled that the alleged constitutional violations resulted from the execution of JC's policy or custom, the *Monell* claim must be dismissed.

### ii.  ADA and RA

The City Defendants also move to dismiss the claims that JC violated the ADA and RA. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Establishing an ADA violation requires showing that plaintiff "is a qualified individual with a disability" who "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities" and that "such exclusion, denial of benefits, or discrimination was by reason of his disability."  *Lopez v. Beard*, 333 F. App'x. 685, 687 n.1 (3d Cir. 2009).  The RA imposes the same rule with regard to "program[s] or activit[ies] receiving Federal financial assistance."  29 U.S.C. § 794(a); *see Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023).  "[D]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

The City Defendants do not dispute that Mr. Washington was a qualified individual with a disability.  It is also clear that the police intervention at issue is part of a public entity's services,

programs, or activities and subject to the RA and ADA.  *See Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018); Compl. ¶ 165 (alleging that JC receives federal financial assistance).

The City Defendants argue that the complaint fails to allege that they discriminated against Mr. Washington because of his disability.  (City Mot. at 23.)  The complaint adequately pleads that Defendants failed to reasonably accommodate Mr. Washington's disability, however, which is sufficient to establish discrimination under the statutes.  For example, instead of sending the requested "mobile outreach of trained mental health professionals," the City Defendants sent police and the "heavily armed" ESU to Mr. Washington's apartment.  (Compl. ¶¶ 5–6.)  They also failed to adhere to the alleged standards for interacting with someone in a mental health crisis, including by continually "bang[ing] on [Mr. Washington]'s door," failing to "call[] for a mental health professional for assistance," and "ignor[ing] the request" of a family member to speak with Mr. Washington.  (*Id.* at ¶¶ 64, 69, 71.)  These accommodations, especially as alternatives to breaking down the apartment door, are entirely reasonable—the City Defendants' claim that it is "unclear as to what services were required to be provided to [Mr.] Washington" (City Mot. at 24), is unfounded in view of common sense and the various standards for handling mental health crises outlined in the complaint.  *See* Compl. ¶¶ 39–47; *Est. of LeRoux v. Montgomery Cnty.*, Civ. No. 22-856, 2023 WL 2571518, at *11 (D. Md. Mar. 20, 2023) (denying motion to dismiss ADA and RA claims in view of alleged "reasonable accommodations … that would have allowed [shooting victim] to effectively communicate, and, in turn, survive the [police] encounter").

The City Defendants also argue that the complaint lacks allegations that JC's discrimination was intentional, as required "[w]here compensatory damages are sought" under the ADA."  *Durham*, 82 F.4th at 225; City Mot. at 24.  Intentional discrimination can be shown "under a deliberate indifference standard," which requires "[a] claimant [to] allege '(1) knowledge that a

federally protected right is substantially likely to be violated ... and (2) failure to act despite that knowledge.'" *Durham*, 82 F.4th at 226 (omission in original) (quoting *Haberle*, 885 F.3d at 181). Plaintiff alleges that Mr. Washington's family informed "officers, including [Officers] De La Cruz and Alas, that [Mr. Washington] was diagnosed with bipolar disorder" and "had recently been released from a psychiatric hospitalization." (Compl. ¶ 61.) The family also told officers that "they had called for the mobile crisis unit." (*Id.*) Finally, Plaintiff alleges that officers could hear that Mr. Washington was in distress from outside his door, and that they "laughed at [him] when he yelled out statements indicating that he was experiencing delusions." (*Id.* at ¶¶ 62–63.)

These allegations are sufficient to establish that Defendants knew of the risk of an ADA violation. Despite their awareness of Mr. Washington's disability, that he was having a mental health episode, and that his family had requested mental health services, they failed to accommodate his disability. This is enough to establish intentional discrimination at this stage as required under the ADA. *See Durham*, 82 F.4th at 226 (finding knowledge of disability and denial of accommodations "alone … sufficient to allege a deliberate indifference claim"). Their laughter at him further supports that the discrimination may have been intentional. *See id.* (alteration in original) (finding that officials' statements that "plaintiff 'complain[ed] a lot' and was an 'asshole'" supported intentionality). Because Plaintiff has adequately pled ADA and RA violations, the motion to dismiss must be denied as to those claims.

**3. State Law Claims**

The City Defendants also move to dismiss the state law claims, including various torts, wrongful death, and survivorship. Before addressing each claim individually, this Court will turn to two general defenses that the City Defendants appear to assert against the state law claims.

25

First, the City Defendants argue that qualified immunity protects the JCPD officials from "all claims" against them, which must include the exclusively state law claims.  (City Mot. at 26.) While New Jersey has adopted federal qualified immunity principles for NJCRA claims as applied above, *see Morillo*, 117 A.3d at 1213, it does not appear to have done so for these remaining state law claims.  Therefore, qualified immunity will not serve as a defense to the remaining state law claims.  *See, e.g.*, *Heggs v. Grant*, 73 F.3d 317, 319 n.5 (11th Cir. 1996) ("[Qualified immunity] does not apply to suits governed by state law."); *Riebsame v. Prince*, 267 F. Supp. 2d 1225, 1231 (M.D. Fla. 2003) (same), *aff'd*, 91 F. App'x 656 (11th Cir. 2004); *Ganley v. Jojola*, 402 F. Supp. 3d 1021, 1101 (D.N.M. 2019) ("[Q]ualified immunity is a creature of federal law—and therefore does not apply to state tort claims."); *Spears v. McCraw*, Civ. No. 15-511, 2018 WL 1463711, at *7 n.6 (W.D. Tex. Mar. 23, 2018) ("Qualified immunity is not a defense to state-law claims ….").  Generally asserting "qualified immunity" against all claims does not warrant the application of distinct statutory immunities that the City Defendants neglect to identify, and absent adoption of federal qualified immunity principles by New Jersey, this Court will not apply them to state law claims.

The City Defendants also move to dismiss all *respondeat superior* claims against JC "asserted under [§] 1983."  (City Mot. at 32–33.)  The claims that assert *respondeat superior* liability against JC, however, are not brought under § 1983.  They are the common law claims for assault, battery, false imprisonment, and negligence.  (Compl. ¶¶ 207, 212, 217, 226.)  The City Defendants' only argument for dismissing the *respondeat superior* claims is that they are not permitted under § 1983 (City Mot. at 33), which does not apply to these common law claims.  The City Defendants fail to acknowledge this issue in either of their briefs.  As the City Defendants have failed to raise a relevant argument supporting dismissal of the actual *respondeat superior*

claims against JC, no claims will be dismissed on that basis. Because neither of the City Defendants' general defenses are applicable, this opinion turns to the individual claims.

### a. Negligent Training and Supervision

The City Defendants move to dismiss Plaintiff's claim for negligent training and supervision. Their response to this claim, however, is mistaken twice over. First, their moving brief treats the claim as if it were a *Monell* claim, which is a means to hold a municipality liable for a § 1983 violation. City Mot. at 19 (emphasis added) (arguing that no allegations support "a training deficiency that directly caused a *constitutional violation*"); *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). The negligent training and supervision claim is in fact pled only under state law and does not seek to hold JC liable for a § 1983 violation. (*See* Compl. ¶¶ 221–23; City Opp. at 34.) The City Defendants acknowledge as much in their reply brief and argue that Plaintiff has still failed to state a state law claim for negligent training and supervision. (City Reply at 4.) Yet again, however, they rely on the wrong standard. Instead of applying the standard for negligent training or supervision, the reply brief applies the standard for negligent hiring or retention. (*Id.* at 4–5.) The case cited by both sides, *Jama v. INS*, makes clear that these are distinct standards. 334 F. Supp. 2d 662, 683–84 & n.25 (D.N.J. 2004); *see also Anderson v. Whole Foods Mkt., Inc.*, Civ. No. 21-12990, 2024 WL 2802963, at *8 (D.N.J. May 31, 2024) (providing both standards).

Because the City Defendants' reply brief substantively argues only that Plaintiff has failed to state a claim for negligent hiring or retention—a claim which she did not bring—and fails to address Plaintiff's claim for negligent training and supervision, the motion is denied as to this claim. Regardless of the City Defendants' deficient briefing, Plaintiff has adequately stated the state law claim for negligent training or supervision. She plausibly alleges that JC could have

foreseen the risk of harm that deploying the ESU would create, and that deployment of the ESU, and the officer's actions pursuant to their supervisors' guidance, proximately caused the injury. *See, e.g.*, Compl. ¶¶ 6–8, 69, 75; *Cooper v. City of Paterson*, Civ. No. 23-03566, 2024 WL 4533326, at *4–5 (D.N.J. Oct. 21, 2024); *supra* n.10.  Absent any relevant argument for dismissal, this claim survives the motion to dismiss.

### b.  Assault and Battery

The City Defendants next argue for dismissal of Plaintiff's state law claims for assault and battery against Sergeant Friend.[13]  A person commits assault if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1117 (N.J. 2009) (quoting *Wigginton v. Servidio*, 734 A.2d 798, 806 (N.J. Super. Ct. App. Div. 1999)).  "[W]ith battery, a plaintiff must allege that there was, in fact, an offensive contact." *Shelley v. Linden High Sch.*, Civ. No. 19-20907, 2020 WL 6391191, at *3 (D.N.J. Nov. 2, 2020) (citing *Leang*, 969 A.2d at 1117).  Physical contact is "essential to the cause of action" of battery, and it can be established through the shooting of a gun. *Kelly v. Cnty. of Monmouth*, 883 A.2d 411, 415 (N.J. Super. Ct. App. Div. 2005); *Doss v. Osty*, Civ. No. 10-3497, 2011 WL 2559558, at *7 (D.N.J. June 27, 2011) (finding that complaint alleging that officer shot plaintiff alleged "harmful or offensive contact").

It is undisputed that Sergeant Friend never physically contacted Mr. Washington.  Plaintiff nonetheless argues that Sergeant "Friend directly caused the assault and battery of Mr. Washington by authorizing and directing the unlawful actions of [Officers] Gigante and DeJesus" because he "was present in the stairwell … and explicitly 'gave the green light' for [Officers] Gigante and

---

[13] Plaintiff's claims for assault and battery were brought against Officers DeJesus and Gigante, Sergeant Friend, and JC (Compl. ¶¶ 205–14), but dismissal is only sought as to Sergeant Friend (City Mot. at 20–21).

DeJesus to break down the door" knowing that they were armed.  (City Opp. at 31.)  This is insufficient to support a battery claim.  *Bullock v. Cabasa*, Civ. No. 10-1412, 2014 WL 5286613, at *11 (D.N.J. Oct. 15, 2014) (dismissing battery claim against defendant who "did not touch the plaintiff" but was alleged to have given syringe to "another nurse to administer the injection"); *Doss*, 2011 WL 2559558, at *7 (dismissing assault and battery claims against allegedly present "complicit" officers who did not contact plaintiff).

As to assault, however, Plaintiff alleged that Sergeant Friend was in the stairwell at the time Mr. Washington's door was broken down, wearing "tactical gear," possibly with a "weapon[] drawn."  (Compl. ¶¶ 67, 75 104.)  Sergeant Friend may also have participated in the discussions "outside [Mr. Washington]'s door about retrieving weapons."  (*Id.* at ¶ 70.)  Making all reasonable inferences in Plaintiff's favor, it is plausible that when the door opened, Mr. Washington was in immediate apprehension of harmful physical contact by Sergeant Friend himself, and that Sergeant Friend intended that immediate apprehension.  Accordingly, the City Defendants' motion to dismiss is granted as to the battery claim against Sergeant Friend but denied as to the assault claim against him.  *See Bullock*, 2014 WL 5286613, at *11 (finding that defendant who was on the scene holding the hypodermic needle that plaintiff was in immediate apprehension of could not "be held liable for battery as a matter of law" but permitting assault claim to proceed).

### c.  False Imprisonment

The City Defendants next move for dismissal of Plaintiff's false imprisonment claim. Under New Jersey law, the elements of false imprisonment are: "(1) 'an arrest or detention of the person against his or her will' and (2) 'lack of proper legal authority or legal justification.'"  *Shelley*, 2020 WL 6391191, at *4 (quoting *Leang*, 969 A.2d at 1117).  "The gist of false imprisonment is merely unlawful detention without more."  *Earl v. Winne*, 101 A.2d 535,

539 (N.J. 1953) (quoting *Lakutis v. Greenwood*, 87 A.2d 23, 25 (N.J. 1952); 1 Addison on Torts (6th ed.), *147).  Detention can occur "by means of physical force *or a show of authority*." *Abuomar v. Dep't of Corr.*, 754 F. App'x 102, 108 (3d Cir. 2018) (emphasis added) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)).  Threats of force can create the detention necessary for false imprisonment if they are "sufficient for a person to be placed in reasonable apprehension of force." *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 334 (D.N.J. 2005), *aff'd*, 691 F.3d 527 (3d Cir. 2012).

Plaintiff has pled that Defendants "entered the stairwell of [Mr. Washington]'s building with shields and tactical gear," "spoke to one another outside [Mr. Washington]'s door about retrieving weapons and audibly readied their tasers," and that at least Officers Gigante and DeJesus "stood outside [his] door with … weapons drawn." (Compl. ¶¶ 67, 70.)  Defendants also allegedly "taped over the peephole on [his] door and secured the door by tying a rope around the doorknob and pulling it tight."  (*Id.* at ¶ 67.)  These allegations are sufficient to have plausibly put Mr. Washington in reasonable apprehension of force, establishing the detention necessary for false imprisonment.  And the detention was not based on a show of authority alone; Defendants also physically confined Mr. Washington to his apartment by tying the door shut.  As they argue no legal basis for this detention (City Mot. at 21–22),[14] the false imprisonment claim will not be dismissed at this stage.

### d.  Wrongful Death and Survivorship

The City Defendants next move to dismiss Plaintiff's wrongful death and survivorship claims.  They argue that wrongful death and survivorship claims must be dismissed when the underlying claims regarding the death are dismissed.  The only claims being dismissed pursuant

---

[14] The City Defendants' assertion that they acted "at the request of the family" is unsupported by the complaint and does not legalize their actions constituting false imprisonment.  (City Mot. at 22.)

to the City Defendants' motion are Count Four, alleging *Monell* liability against JC, and Count Twelve only as to Sergeant Friend.  All other claims, including torts alleged to have caused Mr. Washington's death (Compl. ¶¶ 231–32), and that would have allegedly entitled him to damages (*id.* at ¶ 239), will proceed.  Accordingly, insofar as Plaintiff's wrongful death and survivorship claims rely on those claims as the underlying acts, they may proceed as well.  *See Norman v. Haddon Twp.*, Civ. No. 14-06034, 2017 WL 2812876, at *13 (D.N.J. June 29, 2017) (denying summary judgment on wrongful death and survivorship claims because underlying claims regarding cause of death survived summary judgment).

### 4.  Punitive Damages

The City Defendants next briefly argue that Plaintiff is not entitled to punitive damages because municipalities, public entities, and government officials sued in their official capacities are immune from punitive damages.  (City Mot. at 32.)  Even so, many Defendants here are government officials sued in their *individual* capacities.  (Compl. ¶¶ 24–32.)

The City Defendants also argue that "there are no allegations that [their] conduct was reckless" as to support punitive damages.  (City Mot. at 32 (arguing that the complaint does "not support any claims" at all).)  This mischaracterizes the complaint.  (*See* Compl. ¶¶ 105, 225, 227.)  The complaint alleged that Defendants laughed at Mr. Washington, made false statements to his family, and refused to allow family to join him in the ambulance.  (*Id.* at ¶¶ 63, 80–81.)  In view of these allegations, "it is entirely possible that in proving the elements of [the claims in the complaint], Plaintiff will put forth evidence, developed in discovery, sufficient to sustain an award of punitive damages."  *Shelton v. Garrels*, Civ. No. 06-0891, 2006 WL 8457164, at *2 (D.N.J. July 11, 2006) (denying motion to dismiss punitive damages claim).  It would be premature to hold at this stage that punitive damages are completely off the table.  *See, e.g.*, *J. Fletcher Creamer &*

*Son, Inc. v. Hiscox Ins. Co. Inc.*, Civ. No. 19-21638, 2020 WL 2899499, at *7 (D.N.J. June 2, 2020); *Kerlin v. Howard*, Civ. No. 18-00481, 2018 WL 4051702, at *2 (M.D. Pa. Aug. 24, 2018) (denying motion to dismiss punitive damages claim because plaintiff "has alleged that Defendants' conduct was 'reckless'" and citing cases holding "that it is premature to dismiss demands for punitive damages prior to discovery"). Accordingly, the City Defendants' motion to dismiss as to punitive damages is denied.

### B.   The Hospital Defendants' Motion

The Hospital Defendants also move to dismiss all claims against them. (D.E. 47-1 ("Hosp. Mot.").)[15]  Those claims are civil conspiracy under § 1983, disability discrimination in violation of the ADA and the RA, false imprisonment, and negligence. (Compl. ¶¶ 124–26, 147–61, 174–89, 215–20, 224–29.)

### 1.   Civil Conspiracy

The EMTs were allegedly part of the conspiracy "to deprive [Mr. Washington] of his clearly established constitutional rights." (*Id.* at ¶ 125.) The civil conspiracy claim is brought under § 1983, which provides for liability of "person[s] who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," deprive someone of a federal right. 42 U.S.C. § 1983; *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) ("[T]hat the conduct complained of was committed by a person acting under color of state law" is an "essential element[]" of a § 1983 claim.)

The complaint here has not alleged that the EMTs acted under the color of state law. It alleges that they were employees of JCMC "and/or" its parent company RWJB. (Compl. ¶¶ 36–38.)  Non-public employees can be considered state actors if "the[ir] alleged infringement of

---

[15] The Hospital Defendants' briefs fail to comply with Local Civil Rule 7.2(d) for various reasons, including because the moving brief is not double-spaced. They are reminded for any future briefing to comply with the Local Rules.

federal rights [is] fairly attributable to the State." *Robinson v. Fair Acres Geriatric Ctr.*, 842 F. App'x 779, 782 (3d Cir. 2021) (second alteration in original) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). This determination depends on

> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

*Id.* (quoting *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)).

Here, the EMTs did not exercise powers traditionally held by the state. The "undoubtedly … governmental power" that Plaintiff argues the EMTs exercised is the power to "involuntarily commit people experiencing mental-health episodes." (Hosp. Opp. at 16.) But this is not an involuntary commitment case; the EMTs are not alleged to have taken any steps to commit Mr. Washington. In any event, "other courts in this Circuit … have … declined to find state action on the part of private hospitals deciding to involuntarily commit an individual under New Jersey law or treating an individual." *Miretskaya v. Rutgers, State Univ. of N.J.*, Civ. No. 20-14856, 2024 WL 3896627, at *10 (D.N.J. Aug. 21, 2024) (citing cases). The fact that the hospitals were designated by the government as mental health providers (*see* Compl. ¶ 35; Hosp. Opp. at 16), also does not transform them into state actors, as "*mere approval or acquiescence* of the State is not state action." *Kach*, 589 F.3d at 649 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999)); *Palmer v. John Brooks Recovery Ctr.*, Civ. No. 21-19531, 2022 WL 3681239, at *3 (D.N.J. Aug. 24, 2022) (quoting *Allah v. O'Conner*, Civ. No. 18-4048, 2020 WL 5408066, at *4 (E.D. Pa. Sept. 9, 2020)) ("'[T]he mere existence of a contract' between the treatment center and the state was insufficient to establish that the center 'was acting under color of state law.'")

The allegations also do not support that the EMTs acted in concert with state officials to violate Mr. Washington's constitutional rights or were otherwise interdependent on the state.  The alleged conspiracy to violate Mr. Washington's constitutional rights appears plausibly to have been among the JCPD officials—they handled communicating with Mr. Washington and agreed to "tape[] over the peephole … secure[] the door," and "break down [the] door."  (Compl. ¶¶ 67, 74.)  The EMTs' presence in the stairwell does not make it plausible that they agreed with the JCPD officials to take those actions.  *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 642 (3d Cir. 1995) (finding that "first aid squad" did not act under color of state law despite "functioning as support to the police" because "[t]here [was] no evidence that the Township controlled the first aid squad's professional conduct").  Asserting that the EMTs "communicat[ed]" and "act[ed] in concert" with the JCPD officials, absent any identified communications or actions by the EMTs, is conclusory and fails to allege a meeting of the minds or circumstantial evidence to support a conspiracy.  Compl. ¶¶ 125–26; *see Twombly*, 550 U.S. at 556; *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010); *Chester v. Cape May Cnty.*, Civ. No. 17-39, 2019 WL 2710651, at *5–7 (D.N.J. July 2, 2019) (dismissing conspiracy claim supported only by "bare conclusion" that "defendants … acted in concert with all of the other defendants for the purpose of infringing and then covering up the violation of the plaintiff's rights"), *aff'd sub nom.*, *Chester v. Cape May Cnty. N.J.*, 797 F. App'x 707 (3d Cir. 2020).[16]  Accordingly, Plaintiff has not alleged that the EMTs acted under color of state law.

---

[16] Plaintiff's cited cases on this point involved more substantial conduct by the alleged conspirators than is present here.  *See Fogle v. Sokol*, Civ. No. 17-194, 2018 WL 6831137, at *3, *9 (W.D. Pa. Dec. 28, 2018) (denying prosecutors' motion to dismiss complaint alleging that they "knew [witness's statement] was unreliable" but "decided to proceed with it anyway"); *Harrington v. Bergen Cnty.*, Civ. No. 14-2083, 2015 WL 758634, at *1–2, *12 (M.D. Pa. Feb. 23, 2015) (denying motion to dismiss complaint including detailed allegations of conspiracy and participants); *Mizrahi v. City of New York*, Civ. No. 17-4813, 2018 WL 3848917, at *8–9 (E.D.N.Y. Aug. 13, 2018) (denying summary judgment to EMTs who entered plaintiff's apartment, communicated with her directly, and forcefully escorted her out).

In any event, the allegations against the EMTs are insufficient to support Plaintiff's claim that they conspired to violate Mr. Washington's Fourth Amendment rights.  Plaintiff asserts that the complaint clearly alleges that the EMTs conspiratorially violated the Fourth Amendment by unreasonably calling the ESU, failing to de-escalate the situation, interfering with family members' access to Mr. Washington, laughing at him, and communicating and acting in concert with the JCPD officials.  (Hosp. Opp. at 20; Compl. at ¶ 126.)  No specific factual allegations regarding the EMTs indicate a meeting of the minds that led specifically to the Fourth Amendment violations.   While the EMTs failed to de-escalate the situation, for example, the Fourth Amendment does not guarantee a right to de-escalation or mental health services.  Nor does it protect a right to familial access under the circumstances alleged.  Failure to provide such measures, even if agreed upon, is insufficient to support a conspiracy to violate the Fourth Amendment.  *See Max v. Republican Comm. of Lancaster Cnty.*, 587 F.3d 198, 203 (3d Cir. 2009) (stating conspiracy without end goal of deprivation of constitutional rights is insufficient under § 1983); *Zucal v. Cnty. of Lehigh*, 760 F. Supp. 3d 290, 304 (E.D.P.A. 2024) (dismissing civil conspiracy claim lacking "prerequisite of a constitutional violation").  Accordingly, the civil conspiracy claims against the EMTs must be dismissed.[17]

### 2.  Disability Discrimination

Next, the Hospital Defendants move to dismiss Plaintiff's claims that JCMC and RWJB violated the ADA and RA.  Title II of the ADA prohibits disability discrimination by "public entit[ies]."  *Haberle*, 885 F.3d at 178.  It defines public entity as "any State or local government; … any department, agency, special purpose district, or other instrumentality of a State or States or local government; and … the National Railroad Passenger Corporation, and any commuter

---

[17] The Hospital Defendants also seek dismissal of a claim under 42 U.S.C. § 1985 (Hosp. Mot. at 13), but Plaintiff brought no such claim.

authority." 42 U.S.C. § 12131(1). The RA applies to "program[s] or activit[ies] receiving Federal financial assistance." 29 U.S.C. § 794(a); *see Durham*, 82 F.4th at 225.

Plaintiff alleges that Hudson County, a public entity receiving federal financial assistance, contracts with JCMC and RWJB, so they can be liable under Title II of the ADA and the RA. (Compl. ¶¶ 150, 177–78.) This is insufficient to establish that JCMC and RWJB are public entities or receiving federal financial assistance, however. "[A] private corporation is not a public entity merely because it contracts with a public entity to provide some service." *Matthews v. Penn. Dep't of Corr.*, 613 F. App'x 163, 169–70 (3d Cir. 2015) (quoting *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010)) (affirming dismissal of ADA and RA claims against healthcare personnel and private entity); *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) (finding that "private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction" is not an instrumentality of the municipality).[18] Accordingly, Plaintiff has not adequately alleged that RWJB and JCMC are subject to the ADA and RA, and those claims against them must be dismissed.

### 3. State Law Claims

The final two claims that the Hospital Defendants seek to dismiss are state law claims for false imprisonment and negligence. The Hospital Defendants claim immunity against all claims, including for punitive damages, under N.J.S.A § 30:4-27.7(b), which provides that

> emergency services … pe[ople] or their … employers, acting in good faith pursuant to this act and pursuant to the direction of a person designated in subsection a. of this section, who take[] reasonable steps to take custody of, detain or transport an individual for the purpose of mental health assessment or treatment [are] immune from civil and criminal liability.

---

[18] It is of no moment that Plaintiff contends in her opposition brief that RWJB and JCMC are subject to the RA because they receive Medicaid. (Hosp. Opp. at 23–24.) This allegation is absent from the complaint, and a "complaint may not be amended by the briefs in opposition to a motion to dismiss." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quoting *Car Carriers* v. *Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054 (1984)).

(Hosp. Mot. at 9.)  Subsection a. includes "law enforcement officer[s]" and "screening service[s]" who "in good faith pursuant to [statutes regarding involuntary commitment] take[] reasonable steps to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treament" N.J.S.A. § 30:4-27.7(a).[19]

The Hospital Defendants are not immunized by § 30:4-27.7 here.  The statute was intended to "govern the admission and commitment of persons with mental illness … to the several institutions designated therefor."  N.J.S.A. § 30:4-24 (describing all "provisions of Title 30"); *Ianni v. Bergen Reg'l Med. Ctr.*, Civ. No. A-5911-09T3, 2011 WL 2410120, at *2 (N.J. Super. Ct. App. Div. May 11, 2011) (describing §§ 30:4-27.1 to 30:4-31 as "enacted … to provide a mechanism for the short-term civil commitment of individuals deemed to be harmful to themselves, others or property"); *Miretskaya*, 2024 WL 3896627, at *4 (same).  While this case involved a mentally ill person, the facts as alleged do not support that anyone sought to commit him to an institution.  The Hospital Defendants themselves do not even argue that they intended to do so.  Absent any cited cases applying this statute to a situation that did not involve commitment to an institution, it would not be appropriate to apply here.

The specifics of the statute also weigh against its application.  The Hospital Defendants rely on § 30:4-27.7(b), which immunizes personnel acting "pursuant to the direction of a person designated in subsection a. of this section."  Subsection a. identifies specific actors, including law enforcement officers and screening services, "acting in good faith pursuant to P.L.1987, c. 116 (C.30:4-27.1 et seq.) and P.L.2009, c. 112," which are statutes concerning involuntary

---

[19] The Hospital Defendants also claim that these provisions immunize them from the claims arising under federal law (Hosp. Mot. at 11 (arguing immunity from "all claims")), but "[a] state statute that creates immunity from suit under state law does not define the scope of immunity from suit under federal law."  *Bates v. Paul Kimball Hosp.*, 346 F. App'x 883, 885 (3d Cir. 2009) (holding that § 30:4-27.7 did not immunize defendants from § 1983 liability).

commitment.  The Hospital Defendants argue that they acted pursuant to the direction of mental health hotline (Hosp. Mot. at 10; Hosp. Reply at 4), but it is not clear that the mental health hotline called the EMTs and JCPD "pursuant to" the involuntary commitment statutes.  Plaintiff alleges calling the hotline only "asking for the advertised mobile outreach of trained mental health professionals" and expressing that Mr. Washington had not been taking his medications.  (Compl. ¶¶ 5, 58.)  She does not allege mentioning anything about commitment or transport, so this Court will not assume that the hotline dispatched the EMTs pursuant to the involuntary commitment statutes.  Even if it had, subsection a. requires that the screening service "takes reasonable steps" to "assess, take custody of, detain or transport an individual."  § 30:4-27.7(a).  Dispatching EMTs and the JCPD specifically to commit Mr. Washington, when it was not at all clear from Plaintiff's call that commitment was necessary, would not have been reasonable.  Because the hotline does not meet the requirements of subsection a., the fact that the EMTs acted pursuant to its direction does not immunize them under subsection b.[20]  Accordingly, the state law claims, including for punitive damages, will not be dismissed against the Hospital Defendants on immunity grounds.

Aside from immunity, the Hospital Defendants argue that the negligence and false imprisonment claims also must be dismissed because they are inadequately pled, (Hosp. Mot. at 18–19), so this Court will now address the substance of those claims.

---

[20] Similarly, subsection b. covers only personnel who "pursuant to this act … take[] reasonable steps to *take custody of, detain or transport* an individual."  N.J.S.A. § 30:4-27.7(b).  As none of the facts suggest that the Hospital Defendants sought to commit Mr. Washington, it cannot be said that they acted "pursuant to" this statute.  They state that the hotline directed the EMTs to "provide emergency and medical transport services to [Mr.] Washington." (Hosp. Mot. at 10.)  Nowhere is it alleged that the hotline instructed the EMTs to provide *transport* services to Mr. Washington, nor did the EMTs take any reasonable steps to transport him.  Being directed by the hotline to provide emergency services is not enough to make the statute applicable.  Subsection b. does *not* cover personnel who take reasonable steps to *assess* a mentally ill individual, which is the most the EMTs can be said to have done here.  *Contrast* N.J.S.A. § 30:4-27.7(a) (covering specified actors "who take[] reasonable steps to assess, take custody of, detain or transport an individual"), *with* § 30:4-27.7(b) (covering only those "who take[] reasonable steps to take custody of, detain or transport an individual").

### a. False Imprisonment

At this stage, the false imprisonment claim may proceed against the Hospital Defendants primarily for the same reason that it will proceed against the City Defendants. As explained above, detention for the purposes of false imprisonment does not require physical restraint; it can occur "by … a show of authority," *Abuomar*, 754 F. App'x at 108 (quoting *Mendenhall*, 446 U.S. at 553). Here, the crowding outside of Mr. Washington's residence was sufficient to put him in "reasonable apprehension of force." *Zavala*, 393 F. Supp. 2d at 334. The EMTs were inside the building, in the stairwell contributing to the show of force that Mr. Washington would face if he left his apartment. (Compl. ¶¶ 62, 216 (alleging that the "collective actions" of EMTs and JCPD officials led to false imprisonment).) It is not required that they specifically covered the peephole or tied the door shut. And while the JCPD officials' gear and discussions regarding their weapons were likely the primary contributors to the show of force, the sheer number of authorities outside Mr. Washington's door also played a role. Since the EMTs were in the stairwell, resolving all reasonable inferences in Plaintiff's favor, it can fairly be said that false imprisonment has been adequately pled against the EMTs.

Plaintiff also asserts that JCMC and RWJB, as the EMTs' employers, are subject to liability for false imprisonment under *respondeat superior*. (Compl. ¶ 218.) The Hospital Defendants do not address the *respondeat superior* theory; they argue only that the claim is factually deficient. (Hosp. Mot. at 18; Hosp. Reply at 12–13.) Under *respondeat superior*, "an employer is liable to a third party for the torts of one of its employees if that employee is acting within the scope of his or her employment." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 963 (N.J. 1994). An employee acts "within the scope of employment if the action is 'of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and]

it is actuated, at least in part, by a purpose to serve the master.'" *Id.* (alterations in original) (quoting *Di Cosala v. Kay*, 450 A.2d 508, 513 (N.J. 1982)).  Plaintiff has alleged that the EMTs were employed by JCMC "and/or" RWJB (Compl. ¶¶ 37–38), and nothing indicates that they acted outside the scope of their employment—they were on the job and responding to a call.  Absent any arguments otherwise by the Hospital Defendants, the claims against RWJB and JCMC for false imprisonment may proceed on a *respondeat superior* theory.  The facts underlying false imprisonment—regarding both direct liability of the EMTs and vicarious liability of JCMC and RWJB—need to be further developed, but Plaintiff has adequately pled them at this stage.

### b. Negligence

Finally, the Hospital Defendants move for dismissal of the negligence claim.  Unlike with false imprisonment, Plaintiff alleges that all Hospital Defendants are directly liable for negligence, and that JCMC and RWJB are also liable under *respondeat superior*.  (*Id.* at ¶¶ 227–28.)  The Hospital Defendants' only remaining arguments against negligence are that Plaintiff alleged neither a duty owed nor sufficient facts to support the claim.  (Hosp. Mot. at 19; Hosp. Reply at 13–14.)  Plaintiff responds by outlining two different breaches of the standard of care: JCMC and RWJB's decision to send EMTs and police officers instead of mental health practitioners to the scene,[21] and the EMTs' failure to de-escalate the situation or call for a mental health provider. (Hosp. Opp. at 29.)

As with the police officers, responding to the call created a duty owed by RWJB, JCMC, and the EMTs.  *Brown v. Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d

---

[21] While the complaint does not make clear whether Plaintiff called JCMC's hotline or RWJB's Behavioral Health Access Center on August 27, 2023, it does allege that JCMC and RWJB participated in the operation of HUDCEN, which dispatched the police and EMTs. (Compl. ¶¶ 34–36, 58.)  This "put[s] individual defendants on notice of claims against them" sufficiently to warrant proceeding to discovery to determine more facts, which may streamline the claims.  *In re Swarthmore Grp.*, 667 B.R. at 269.

473, 477 (3d Cir. 2003) ("[O]nce voluntarily undertaken, a rescue must not be performed negligently.")  Two other elements of negligence, breach and proximate cause, are both fact-intensive questions involving the foreseeability of the injury.  *In re: Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 236 (3d Cir. 2017), *aff'd sub nom.*, *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446 (2019); *Vanesko v. Marina Dist. Dev. Co., LLC*, 38 F. Supp. 3d 535, 543 (E.D. Pa. 2014) (applying Pennsylvania and New Jersey law).  Given the numerous similar cases of police encounters with the mentally ill resulting in deadly force, *see supra* p. 17, and absent any specific argument from the Hospital Defendants otherwise, it would be premature to hold that the Hospital Defendants could not have foreseen the injury that resulted from their conduct.  It is also entirely plausible that without police presence, or even with intervention from a mental health provider had one been called, Mr. Washington may not have died.  *See Vanesko*, 38 F. Supp. 3d at 544–45 (denying summary judgment because a reasonable jury could have concluded that defendant could have prevented injury with proper training and effective security).  At this stage, Plaintiff has pled that these breaches proximately caused Mr. Washington's death sufficiently for the negligence claim to proceed to further factual development.[22]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the two motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.  Count Three as to the EMTs, Count Four, Counts Six and Eight as to RWJB and JCMC, and Count Twelve as to Sergeant Friend are **DISMISSED** without prejudice.  Plaintiff shall have thirty (30) days to file an amended complaint.  An appropriate order follows.

---

[22] The negligence claim may proceed against JCMC and RWJB on direct liability and *respondeat superior*.  As with false imprisonment, Defendants offered no reason to believe that the EMTs acted outside the scope of their employment while responding to the call.

_/s/ Susan D. Wigenton_
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    Parties
       Jessica S. Allen, U.S.M.J.